Good morning, your honors. My name is Donald Klein, and I represent Appellant City of Englewood. At the outset, I would ask to reserve three minutes for rebuttal. As the Court knows, this case involves the constitutionality of an ordinance of the City of Englewood, New Jersey, which creates an eight-foot buffer zone around entrances and driveways to health care facilities in the city. The District Court granted Plaintiff, a sidewalk counselor, summary judgment on overbreath and narrow tailoring grounds, and denied the City's motion for summary judgment as moot. Where there are, as here, cross-motions for summary judgment, the Court must draw all reasonable inferences in favor of the party opposing the motion. We submit the District Court failed to do that here, as I will point out throughout my argument, weighing evidence, making credibility determinations, and ignoring material issues of fact. I'm sorry, this has got to be a little lower. The District Court also misapplied the law. For example, in ruling that the City's buffer zone ordinance was overbroad, the District Court relied on the Supreme Court decision in McCullen. However, the Court in McCullen, as this Court pointed out in Brunei, expressly stated that it was not considering petitions' overbreath challenge, nor did the District Court reference the series of Supreme Court and Third Circuit cases cited by the City that hold that comprehensiveness can be a virtue rather than a vice, and that the overbreath doctrine should be employed sparingly. Now, I know that the radius is not the be-all and end-all, but it's certainly significant. Maybe you could focus on the extent to which the eight-foot radius here differs from McCullen. In Brunei, I think it was 15 feet? In Brunei, it was 15 feet. In Englewood, it was 8 feet. In Englewood, it was 8 feet. In McCullen, it was 35 feet. 35, okay. Yes, and that was the point I was moving to. In McCullen, the Court said that Massachusetts has taken the, quote, extreme step of closing a substantial portion of a traditional public forum to all speakers. Indeed, it can be argued that size drove the analysis in McCullen, because if you look at some of the language of the Court, it says the zones carve out a significant portion of the adjacent public sidewalks, pushing petitioners well back from the clinic's entrances and driveways. The zones thereby compromise petitioners' ability to initiate the close personal conversations that they view as essential to sidewalk counseling. In fact, the petitions in McCullen were driven all the way across the street. The critical issue in this case, as in all of these cases, I believe, is whether the plaintiff is able to converse at a normal conversational distance. Is that the only factor we must consider in this case? It's not the only factor, but it is a significant factor in this case because of the relationship between the 8-foot buffer zone and the ability of plaintiff to communicate at a normal conversational distance. Is it the ability or is it whether or not it's a material fact about the extent to which if at all the 8-foot buffer zone interferes with that right? I think minimally it's a material issue of fact in this case. But I think if you look at the decision in Hill, while the facts were somewhat different, the one point that the Supreme Court made in Hill v. Colorado is that at 8 feet, people can talk in a normal conversational district. And did not Ms. Turco in this case indicate that she was able to communicate her message? Absolutely. She couldn't leaflet. She couldn't hand out leaflets, but she could. Actually, didn't she indicate that the warnings, at least to the extent that it stopped the vociferous protests, enabled her better to communicate her message? Yeah. I mean, my argument in large part is that she's much better off after the buffer zone ordinance than before. She was complaining about what was there at the site, her inability to communicate with patients, because absent the buffer zone, she was getting blocked out by all these other people that were there. But what about the leaflet? How crucial is that to the expression right? She can't really – she can converse in a normal tone of voice. She can't really hand out leaflets unless she makes them into a paper airplane and flies across the zone. Yes. Well, Your Honor, the reality is that she is trying to communicate people. She's trying to have them stop and talk to her before they enter into the facility. She also wants to hand them stuff. She wants to hand them stuff. And my point is that she doesn't have to be any more than eight feet away from people. And she can certainly endeavor to do that prior to the time they get to the buffer zone. I mean, the point here is – How do they know where they're going? How does she know where the person's going before they get into some proximity to the facility? This plaintiff has been there every Saturday for the last eight years. She knows who the patients are. She says these demonstrators all change all the time. And that's what your position is because it cannot be identified. No, the protesters change, but the patients don't change. She can identify who the patients are because she's been there. She's there several times a month. The first time she wouldn't know. The first time she might not know. But the reality is you can – there's quite a distance you can walk prior to the time you reach the buffer zone. I mean, she can walk right up to the buffer zone from the south. On the north side, there is a buffer zone near the driveway facility, the driveway. But she can either simply walk for about six feet across the gutter and reach the inner buffer zone. And as we represented at the time of the plenary injunction hearing, if her object is to get from the north into the inner buffer zone, she can do that as long as she doesn't do anything but walk through the zone at that point to get to the inner buffer zone. The reality is when I asked her the question in her deposition, have you been able to talk to patients on a regular basis both before and after adoption of the ordinance, she said unequivocally, yes. Similarly, sidewalk counsel Rosemary Garrett, who was a plaintiff in an earlier litigation which was voluntarily dismissed, testified that she was not bothered by the buffer zone and has continued to counsel patients. This is markedly different than the situation in McCullen, where petitioners acknowledged that they had experienced a precipitous decline in success rate following adoption of the 35-foot buffer zone. One person said she had 100 successful things before she had one or two since the buffer zone. It's a 35-foot buffer zone. It's not determinative, but it's a very significant factor when you look at the issue of whether or not someone can communicate in a normal conversation. What else? If it's not determinative, what are the other factors we need to look at? Well, I think one of the factors you have to look at, and the district court in this case did not, although the district court in Brunei did on a case that's coming up on appeal as well, is what are the governmental interests here? The district court said nothing about it, but this is what the Brunei district court said in responding to McCullen, and it says that as the Supreme Court repeatedly has held, ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services are significant governmental interests, and McCullen went on to say, as quoted by the district court in Brunei, the buffer zones clearly serve those interests. What did you present in terms of consideration of less alternative? I know you don't have to have the least alternative restriction, but you do have to show that you considered less restrictive alternatives or ruled them out as being ineffective. Absolutely, Your Honor, and the way this problem developed around the site in October of 2013 up until March, the six-month period before the buffer zone was adopted, the initial reaction was to increase police presence, and that was done, and that was effective to a degree. That wasn't very expensive, but the city said it was, right? No, no, we did that. Why not do it all the time? Because there are conflicting considerations here. We had a situation where we had increased police presence whenever we thought there was going to be a problem at the site. It worked, and it worked pretty well. It worked pretty well up to a point. However, the police would get out of their cars. They would go talk to people. Sometimes there were resolve issues there and whatever. We had police driving by the site more frequently, particularly on Saturday mornings, getting out of the cars. We were trying to help the clinic get off to the police officers to work for the clinic. Nobody wanted to do that. This was not something that people wanted to do. Most importantly, I think, police were attempting to take information from people who would then file complaints, but that just wouldn't happen. People were not willing here to file complaints, and I think the thing that was totally worth it. That's one of the things here that puzzles me, because I understand and I want to understand why people, given the vitriolic atmosphere that existed because of some of the folks there, not Ms. Turco, I understand that, but some of the other groups involved, I would fully understand why people wouldn't want to come forward, give their names, and there's testimony in there that somebody who did that had a bullseye put on the picture on the Internet. Correct. Pretty horrible stuff, but yet in order to meet this litigation, somebody had to come forward and they were willing to come forward. Your Honor, what happened was most of the people that I submitted certifications from were people who were employees of the city, city police or whatever. I did get one volunteer escort under condition of her not providing her address. We took her deposition in New York under the understanding we would not reveal the information. These people were fearful of a reprisal because there had been reprisals in other situations. It's slightly different getting somebody to submit a certification trying to support the buffer zone ordinance in the context of pulling a junction hearing and going out on a limb and identifying somebody as an aggressor or somebody that's done something terrible and then wind up on that list. That's what people were not willing to do. As a matter of fact, Lynn Albrant, who was the city council president, said that we were in a nuclear arms race to the bottom. On a Saturday morning when a volunteer escort was in tears, terrified of filing a complaint, I knew in my heart, my head and gut that we were weeks if not days away from somebody getting hurt. There were six complaints. The proof that has been submitted by my adversaries with respect to this say there were six complaints and that proves that people were willing to come forward. Well, it actually proved my point. Three of those complaints were six months before the situation got bad in October. In the other cases, none of them involved a volunteer. None of them involved a patient. One volunteer escort was a male escort, and he only was responding because there was a complaint also being filed against him when a protester had pushed him. What I find reprehensible is the argument or the characterization of these people's legitimate fears of reprisal, which really drove everything here, because you couldn't enforce laws unless people were willing to come forward and make complaints. Plaintiffs wouldn't make complaints. She was complaining informally all over the place, but she wasn't willing to come forward. It's another fact issue, a material fact issue, because plaintiffs' own counsel said in a May 22, 2017, submission, the district court for the unwillingness of witnesses to come forward with complaints, quote, is preeminently a matter of factual dispute. Yet notwithstanding this. Let me say this a little bit. I understand your position. You're going to use this sometime for rebuttal, so we'll hear back from you. I'm sorry? We'll hear back from you. I had to go a little bit. Oh, my time's up. So now we're going into a full-time argument here. I'm sorry. I have a little trouble hearing today. No problem. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. I'm Francis J. Mannion, representing the appellee, Gerald Turco, in this case. I think the first thing we need to do is understand exactly the dimensions of these buffer zones. It's not one buffer zone at 40 Engle Street. It's at least two. There's the radius buffer zones at the doorway and at the driveway, and then there's the rectangular zone that comes out from the doorway and the driveway. As the district court correctly characterized it, we're not talking about an eight-foot gap. We're talking about from the left of the door to the right of the door, 24 feet at the wall, and then narrowing as it radiates out from there. We're talking about a significant… Where do you get 24? I get where it's eight feet from either side of the door. I'm not great at math as Mrs. Casey, but I tell you, I'm an eighth-grade English math teacher. I swear I'm responsible for her death. But I think eight is 16. But the door itself is eight feet. Oh, I see. That's not disputed here. I can still follow you there. Right. That's about as far as I can get to you. Okay. And the rectangle comes all the way out to the street. So the reality is that if Turco is standing to the left of the door observing the buffer zones, because, remember, if she walks in the buffer zone knowingly, she faces a minimum mandatory fine of $1,000 plus additional fine. Anyway, she cannot walk through the zone. If she sees someone that she thinks she wants to talk to coming from the north side of the building, she has to go out in the street. She has to go out in the street, watch out for traffic. But she did demonstrate that the zone did not interfere with her ability to have conversations. She is still able to have some conversations with some people at some times. But so was Mrs. McCullen. The testimony in the McCullen case was that Mrs. McCullen had successfully persuaded 80 women after the enactment of the Massachusetts law to forego the procedures that she was counseling them about. There's no question that having to – remember, the default position is that Turco, who has never been accused of in any way being disruptive or being a lawbreaker, Turco has the right to the entire sidewalk. It's a traditional public forum. She now has to circumnavigate two radiuses, walk out in the street, and if the person is still to the right of the driveway, she then has to walk out in the street again. What do you make of statements of undisputed fact, 41 and 42, where it says, approaching from the south, plaintiff could walk directly up to the perimeter of the eight-foot buffer zone to the left of the doorway to the MMA facility, and approaching from the north, plaintiff could walk to the perimeter of the eight-foot buffer zone to the right of the doorway if she walked at the street line at the end of the driveway to the facility. I think, Your Honor, that's just to the right of the driveway. Oh, okay, to the right of the – yes, if she walks out into the street. She has to walk out into the street. It's a busy street, no dispute about that. There are frequently cars parked along the curb, and in the wintertime, there's snow piled up on the curb. The McCullin Court said whenever the government makes it more difficult to engage in this sort of traditional First Amendment activity in a traditional public forum, it is a significant, and especially significant, First Amendment burden, and that's the reality here. I understand why the city likes to talk about this as an eight-foot buffer zone, but it's actually far more than that. Yes, eight feet is a normal conversational distance, if you're having a normal conversation, but that's not the reality of what Turker's doing. It's not the reality of what the Supreme Court described as sidewalk counseling in McCullin. It's somebody trying to have a close-up eye contact. One of my coaches said somebody's moving. If you run into that, that eight feet does not allow for – I don't know if you saw this, but I'm imputing anything to that, but eight feet makes something obviously personal and sensitive. It's a very sensitive matter and a relatively confidential matter. Yes. That kind of a conversation, and I would normally agree with you that eight feet is a bit far, but under the analysis in Hill, it's sufficient for that kind of a conversation. Hill was not a fixed buffer zone case. Hill was a moving bubble zone case that was not relied on to any extent by the Supreme Court in McCullin. It was referred to in describing the basis of Massachusetts' law that they look to Hill, as I suspect Englewood did here, too. Why wouldn't the decision in Hill be compelling or controlling on us with respect to the over-breath claim? Because Hill specifically addressed over-breath, and McCullin didn't. The Supreme Court cited McCullin. Well, not the Supreme Court. The district court here cited McCullin for over-breath, which is something that Professor Donosky said the court didn't decide. It does appear that the district court in this case conflated the over-breath argument with the over-breath part of narrow tailoring, because recall that in McCullin, and as this court noted in Bruni, the over-breath of the Massachusetts law was in and of itself deemed to be hardly a narrowly tailored solution to Massachusetts' problem. So the Supreme Court says in McCullin that even if we accept what Massachusetts says about we tried other things and they didn't work, other laws would be ineffective, even if we do that, the fact that this applies to all clinics in Massachusetts at all times, when the problem arises at only one, makes it not narrowly tailored. So we can leave aside the separate over-breath challenge here. The breadth of the ordinance is still a significant part of the narrow tailoring argument. So it's crucial, I think, in beginning to get straight exactly the extent of the burden here. It's not simply an eight-foot gap. Remember, the person is moving. The person doesn't necessarily want to hear from Mrs. Turco, but she has a right under the First Amendment to attempt to engage this person in a conversation. Yes, but the person she's trying to attempt to engage also has a right not to listen. Absolutely. Absolutely. But what Englewood does is make it impossible for her to even try to engage her, because she has to stop at an arc, walk out into a street. Meanwhile, the person she's trying to engage in conversation is still moving. By the time she circumnavigates the radius, the rectangle, the other radius, the person's probably in the door. That's a significant First Amendment burden. Is there any particular distance that you think is constitutional here, as it bothers him? I don't think there's a magic number, Your Honor. We didn't ask you for a magic number. Is there any distance? Say one foot. Would one foot be sufficient? From the center of the door. Here's the answer to that. A much larger buffer zone might be permissible constitutionally if the city or the government has done what the Supreme Court said in McCullen it has to do. If it has attempted or seriously considered and reasonably rejected, as this Court said in Brony, less burdensome alternatives. This is a fact, because this testimony here from legislators is explaining why they did this, the fact that they could not, with other things more serious in their view, in the state of Illinois they could not deploy somebody specifically to sit outside the facility that the police officers did not want to hire themselves out for off-duty protection. I think that that is not significantly probative enough to raise a genuine issue of fact. It's a mere conclusion by the police chief when he says it was cost prohibitive. But here's the crucial distinction here. What he said was it would be cost prohibitive to have a policeman there whenever the place is open. The place is open six days a week, all day long. We're talking about three hours, one day a week. There's nothing in there. He never offered anything. Not even a conclusory statement about what the cost would be. Just right on the back of an envelope. Here's what a cop in Inglewood makes and here's what three times that is. We don't even have anything like that. We just have the conclusion of the police officer. But even that, and we understand why that doesn't raise a genuine issue of fact, because the city administrator testified he wouldn't even consider doing that. Because he, obviously incorrectly, thought that policing the public sidewalk in front of 40 Engle Street was the responsibility of the owners of the building. Clearly not the case. It's a city sidewalk, a traditional public forum. So whatever the police chief's conclusory opinion was about the cost of it, the city administrator, who's the guy who actually writes the checks and makes out the budget, said he would never consider doing that. So Inglewood can't come here and say, we seriously considered doing something that the city administrator said, as a matter of principle, he would never consider. Well, but if the police chief, and I don't know if Inglewood is any different than most states, but I would imagine the chief executive, I would assume, could override the police chief's decision with a point of no remark. If the police chief says, I'm not doing it for whatever reason, isn't that enough, at least in terms of summary judgment, as to whether or not that is sufficient to get past summary judgment? I don't think so. I think it's a mere conclusion on the police chief's part. It's not supported by anything. In the Bruny case, for instance, the city of Pittsburgh, at least, had a finding by the state's Department of Economic Development that the city was in a financially distressed state, and therefore there was documentation that the city stopped paying overtime to a large extent. That sort of evidence is at least in that case. We have nothing. Where does the three hours come from? You said we're not talking about six days a week, we're only talking about three hours. Where does that three hours come from? All of the witnesses agree that the problem only exists when this bread-of-life group is there, and they're only there three hours a week. There's actually some testimony that they're only there every other week. Well, that is true, though. If they know, given what is in the record about the nature of that group, if they know that if they come for certain hours, there are going to be police there, if they come other hours, there won't be any police. There's nothing to prevent them from just coming when there's no police. Well, Englewood has to try that first. I mean, I think that's the whole point of McClellan. To what extent? We do have to give some deference to city administrators, don't we, under this? We're not talking about these restrictable things. So there's some deference there. And it does seem to make common sense to me for a police chief to say, well, it's expensive. I don't know how big the police force is, I'm not sure if that's on the record, or how big the city is. I could have Googled that, but I didn't. And I think that's part of the problem. It's their burden. It's the city's burden here to prove the constitutionality of the ordinance and to establish all the elements of that. But if they don't put that in the record. They simply have to defer. Is it their burden or is it your burden to come forward with some evidence to negate the rationale that they're giving? Well, we do. The city administrator says, I wouldn't do it. I wouldn't consider doing it at all. That negates it entirely as far as we're concerned. As far as the city's failure to try the alternatives that the Supreme Court talks about in McClellan, there's no indication that the city ever considered any other type of law. When the Supreme Court struck down. What other type of law would you propose? Well, in the first place, there are laws already on the books that address every item of misbehavior that's described. In the city in the past that obtained injunctive relief. In the 1990s, the city obtained an injunction that completely solved the issue that arose in the 1990s. It only reoccurred. It only reoccurred and the city could have done the same thing. The city tries to excuse that by saying, well, we don't know who these people are. That's simply not true. The record is full of the name of the group, and everyone agrees it's this one group, its leader, and two members. There are complaints in the record against these people that were filed. Why those complaints didn't become prosecutions, we don't know. But again, that's the city's burden to explain that. There is evidence in there about the aura of intimidation and fear. Yes, there is. That's why you can't prosecute if you can't get somebody to bear the witness stand. Right. But the doctors who worked there contacted the police. They filled out complaint forms. They wouldn't be inside while this was going on. But you would think if anybody would have an understandable fear of overzealous protesters on this issue, it would be the doctors themselves. But they had no fear in going to the city council, signing a letter that's in the record, with their full names, their address of where they are during the week, and they contacted the police. You're completely right. Because the kind of activity that we're talking about is harassment as people approach. The doctors are not going to know about that. They did complain about that, though. Was that because it's going to get heard? No. There's a complaint in the record in November, which is when this issue became a hot issue in Inglewood, from one of the doctors who was outside the building and claimed that he was harassed by the Bread of Life group, and the police went and got identification from two of the members. This is not a secret. This is not some fluid, unidentifiable group. There are specific individuals causing the problem. Clearly the First Amendment requires, as explained in McCullen and Bruni, that the city attempt to do those things. It did not. It's the burden on the city to explain why, not just to simply shrug its shoulders and say, well, that wouldn't work. That's what Massachusetts said. The Supreme Court made short work of that in McCullen. It simply doesn't carry the day here. Did any of these doctors file complaints or were they just kind of... We don't know. We don't know what happened to them, Judge. Complaints are in the record, but they didn't become prosecutions. The city doesn't explain why. There's nothing in the record that explains why. We don't know. But, again, that's not our burden to explain why the doctors' complaints didn't become prosecutions. Robert would be the charge of harassing. Harassment, intimidation, threats. Another interesting part about the complaint is that activity wasn't taking place in what is now the buffer zone. So the solution that the city came up with doesn't even address much of the bad behavior that gave rise to the ordinance in the first place. Am I wrong in understanding that Ms. Turco felt that the imposition of the buffer zone at least resolved the problem with the vociferous protests and made it easier for her to communicate?  I think she said that the first day the buffer zone went into effect, a reporter asked her, and she said, this is better. But in her deposition, she said, but since then, things have gone back to where they were before. The Bread of Life people are still disruptive, still vociferous. General Turco wished the city would do something also, but not against her. Against the people that caused the problem. That's what the Constitution demands. That's what McCullin demands. That's what this court said in Bruni. I see that my time is about up. You can still keep going. You don't have to keep going. You can't keep going until it's over. I think I've addressed how the overbreath argument is also part of narrow tailoring, and I think that's important because the city makes much of the fact that it's true that McCullin and Bruni didn't go there as a separate overbreath challenge. But that doesn't solve the problem. So are you saying, though, that you do not have a stand-alone overbreath claim? We're not withdrawing it, but we're not pressing it here. We don't need to. It's part of the narrow tailoring argument. And here, when you look at what they did here, the city of Englewood, in order to address a problem that arises three days a week at one location, passed an ordinance that applies to perhaps a dozen locations throughout the city of Englewood. And this isn't just theoretical. They went out and painted yellow lines in front of podiatrists' offices, orthopedists' offices. And the court has argued that that cuts against you because it shows that it's content neutral. Well, McCullin doesn't say that. McCullin says just the opposite. McCullin doesn't overrule Hill either. It doesn't expressly overrule Hill, but it does say that doing what Massachusetts did, which is closely analogous to what Englewood did here, is hardly a narrowly tailored solution. So I think it does significantly. I think it's dispositive as to the narrow tailoring because the court said to McCullin, even if they're right about the ineffectiveness of other laws and other measures, the mere fact that it applies all over the state makes it not narrowly tailored. In conclusion, we're talking about the First Amendment here. We're talking about a traditional public forum. The default is that Gerald Turco is allowed to use this sidewalk unhindered. The city has significant interest. We don't dispute that at all. Okay. Well, we understand before you cut yourself off, when you still have time remaining, you know you're here. Okay. Others decline to go through that in a little bit. But we ask you now something you already argued. All right. Thank you, Your Honor. Thank you. I have about a half dozen very quick comments, I hope. The first, and I'll try to take them in a sequence that my adversary raised it. In describing what he calls a 24-foot buffer zone, I was listening to him, and I got the impression that on the left of the facility there's a line that you draw right out to the street, and there's another line on the other side you draw out to the street that's 24 feet. That's not the case. The case is you go eight feet to the left of the door, then there's an arc, and that arc converges before you even get to the street with the rectangular buffer zone that comes out. So I just wanted to clarify that because it's not like there's this massive 24-foot rectangle that's out there. How wide is the door? The door is eight feet? The door is roughly eight feet. I think we've accepted that. McCullen, again, I was looking for the site and I didn't find it, but there were two people that testified in McCullen about the effect of the 35-foot buffer zone. One basically said that there was 100 or whatever, and she had maybe one or two successful ones. McCullen may have had 80, but the testimony in that case was that it dropped very, very significantly. Very few successful ones after that. This notion of having to walk out into the street, we're talking about somebody. That's assuming that she doesn't take the letter we submitted to the court, which basically allows her to walk through the one buffer zone to get to the other. All she has to do is walk right along the perimeter, right along the driveway, not into the street. That's kind of a curious argument, which raises a material fact issue, because there's testimony in this case by a volunteer escort who saw a plaintiff every single day, and they called her the runner, because she would chase people for blocks down the street and suggest that that person is afraid to walk along a six-foot driveway or an eight-foot driveway, right on the gutter line, when the traffic is only coming one direction. She doesn't have to turn into an Olympic-style sport. The point is it's a one-way street. You see all the traffic coming. It's not a difficult thing to do. But she has to do it. She has to put on her Nikes or Adidas, whatever she wears, and just jet down the street. She doesn't have to do that, Your Honor. But she does sometimes, because according to the testimony, whether it's people leaving the facility or whatever, she's been known to do that. So I just find it a little hypocritical in terms of the argument. The other thing that's important about the reliance on the testimony of experienced police officers, I think that's an important issue. The Brunei District Court found that a significant factor, that you had a police chief say that a buffer zone, from my experience, is the best way to deal with this. We have the same thing in this case. We have the police chief who was at the situation 20 years before, where people were coming in in bus loads, chaining themselves to the facility. That's what the issue is. But he also had the experience later when this situation developed. And he basically said, in my experience, what's really critical here is just create some degree of separation between the protesters and the patients. And that's what was done here. The city went, they didn't follow McClellan, they went to the lowest possible size buffer zone they could find, which was really Hill, and created the eight-foot buffer zone. Mr. Maynard's argument that the problem only occurs about three hours, one day a week, and yet this buffer zone is there. You anticipated my argument, Your Honor, though, is that the experience is when the police are there, things tend to get a little better. The facility's open six hours a week. If you have police there three hours a day, what's the standard they're not going to just show up in the afternoon or show up some other time? It's not, you know, we didn't have a lot of time under the circumstances to be making, I mean, the situation was bad at the facility, as I think the papers indicate. And something really, I think, had to be done. And the other thing is the buffer zone has worked. Almost everything I'm saying minimally raises the material fact issue, given the record in this case. But it has worked. But Ms. Turco's perspective, it hasn't worked because she can't distribute her flyers and it may well be that she fills all of this record testimony to the contrary. But she may feel that she can't have the kind of conversation, the quality of conversation, that she would want to have. Well, I think that's inconsistent with her testimony that she's able to, has been able to do it on the same kind of regular basis she did before the ordinance. I also think that you have to look at her testimony. When I asked her, do the protesters, do they adhere to the buffer zone? She says, for the most part, yes, that's not a problem. That's not the problem. So that has actually made it much easier for her. You know, we have a picture of her where she can stand right on the side of the buffer zone. And she has plenty of opportunity to try to get people to stop and talk to her. That's not what she wants. She wants the ability to start on one side of the street and keep talking to people. And if they haven't, you know, she hasn't convinced them in the first 20 or 30 feet, walk right up to the door. You know, without the buffer zone, all you'd be running into at that point are the protesters who would be not far from the door. Thank you so much. I can't let you go a little bit more than I did, Mr. Mannion, but I'd need to try to maintain some kind of equilibrium in terms of the red photons bouncing in my eyeballs there. I'm finished, Your Honor.  Thank you. Thank you. Thank you.